FILED

2016 Oct-06  AM 08:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

KRISTINA MAPLES,                )
                                )
        Plaintiff,              )
                                )
v.                              )          Case No. 5:14-cv-01031-TMP
                                )
CITY OF MADISON BOARD           )
OF EDUCATION,                   )
                                )
        Defendant.              )

## <u>MEMORANDUM OPINION AND ORDER</u>

This cause is before the court on the motion for summary judgment filed November 2, 2015, by the defendant, City of Madison Board of Education ("the Board"). (Doc. 26). The Board seeks dismissal of all of Kristina Maples' ("Plaintiff") claims arising from alleged discriminatory treatment she received following the birth of her child. This matter has been fully briefed, and the court has considered the evidence and arguments set forth by both parties. The parties have consented to the exercise of dispositive jurisdiction by the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c). (Doc. 13).

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 47 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met its burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting former Fed. R.

Civ. P. 56(e)).   The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. Celotex, 477 U.S. at 324.   "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."   Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court "shall" grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a).   The substantive law will identify which facts are material and which are irrelevant.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   Id. at 248.   "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."   Id. at 246.   His guide is the same standard necessary to direct a verdict:   "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."   Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n. 11 (1983).

However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The evidence supporting a claim must be "substantial," Marcus v. St. Paul Fire and Marine Ins. Co., 651 F.2d 379 (5th Cir., Unit B, 1981); a mere scintilla of evidence is not enough to create a genuine issue of fact.  Young v. City of Palm Bay, 358 F.3d 859, 860 (11th Cir. 2004); Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1249-50 (11th Cir. 2004).  If the non-movant's evidence is so thoroughly discredited by the rest of the record evidence that no *reasonable* jury could accept it, the evidence fails to establish the existence of a genuine issue of fact requiring a jury determination.  See Scott v. Harris, 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007) ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have reviewed the facts in the light depicted by the videotape."); Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1290 n. 3 (11th Cir. 2009).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).  Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence

on which the jury could reasonably find for the plaintiff.  Anderson, 477 U.S. at 255.  The non-movant need not be given the benefit of every interference but only of every reasonable inference.  Brown v. City of Clewiston, 848 F.2d 1534, 1540 n. 12 (11th Cir. 1988).  Utilizing these standards, the court undertakes the analysis of whether the defendant has shown that it is entitled to judgment as a matter of law.

# FACTS

The facts, taken in the light most favorable to the nonmoving party, are as follows.

## A. *Plaintiff's Employment*

The plaintiff, a teacher, began working at Mill Creek Elementary School ("Mill Creek") in Madison, Alabama, at the beginning of the 2010-2011 school year.  She worked as a third-grade teacher at Mill Creek from 2010 to 2013.  The plaintiff previously had worked in Arab City Schools, Vestavia Hills City Schools, where she obtained tenure, and Whitesburg Christian Academy.  The first three years of the plaintiff's employment at Mill Creek were probationary, as is required for public school teachers in Alabama.  If her teaching contract were to be renewed for a fourth year, she automatically would obtain tenure with the school district.  If a tenured teacher is to be terminated, she is entitled to a due process hearing, but it

is not in dispute that a probationary teacher may be "non-renewed" without a due process hearing before the end of her third consecutive school year.

During her probationary employment at Mill Creek, the plaintiff received only positive feedback from Melanie Barkley ("Barkley"), the principal of Mill Creek, and Kacy McKay ("McKay"), the assistant principal of Mill Creek. She was not notified by either Barkley or McKay that her performance was deficient, and the plaintiff denies that her performance was deficient. The plaintiff's teacher evaluations for the 2010-2011 and 2011-2012 school years contain no comments from Barkley or McKay indicating the plaintiff's performance was deficient. During her time at Mill Creek, the plaintiff was chosen for several committee positions in addition to her role as a teacher. In her third year at Mill Creek, she was chosen by Barkley and McKay to serve as the third-grade "inclusion teacher" for the 2012-2013 school year. At Mill Creek, the inclusion teacher is tasked with implementing accommodations to meet the needs of special education students in order to improve those students' learning. According to Barkley, the plaintiff was chosen for this position because she is "structured" and "organized." (Barkley Depo., pp. 122-123). It was also for these reasons that Mill Creek assigned difficult students to the plaintiff's classroom.

Near the end of plaintiff's third year at Mill Creek, Barkley completed a written teacher evaluation of the plaintiff on May 6, 2013, which stated that "Mrs.

Maples collaborates with her colleagues to integrate literacy instruction throughout the curriculum;" and that the plaintiff "collaborates with grade level and with the vertical communications team." (Barkley Depo., pp. 116-17). The plaintiff never met with Barkley or McKay regarding complaints from parents about her teaching, inappropriate tone during parent conferences, or a lack of collaboration with colleagues. If the administration has concerns regarding the performance of any teacher, additional formal observations of that teacher's classroom may be conducted. During her three years at Mill Creek, the plaintiff received only two formal observations of her teaching. The first, conducted by McKay, occurred during her first year, the 2010-2011 school year. The second was conducted by Barkley in plaintiff's third year, in March of 2013.

During the 2012-2013 school year, the plaintiff was selected by Barkley and McKay to serve as a leader on the vertical communications team, to be a member of the school's Strategic Leadership Team, and was appointed "grade level teacher" for the third grade. The vertical communications team was tasked with solving problems that arose at Mill Creek and communicating those problems and resolutions to faculty, students, and parents. The plaintiff served as the liaison between the administration and the vertical communications team. The Strategic Leadership Team worked closely with the administration regarding school-related issues. As "grade level teacher," the plaintiff was expected to conduct meetings

with grade level instructors in order to disperse information provided to her by the administration.

In the spring of 2012 (plaintiff's second year of employment at Mill Creek), the plaintiff applied for the position of Assistant Principal at Madison Elementary School. She informed Barkley that she was applying and requested a recommendation, which Barkley agreed to provide to the principal of Madison Elementary. Subsequently, Barkley did complete an electronic recommendation for the plaintiff. During the 2011-2012 and 2012-2013 school years, the plaintiff's classroom was named an "Accelerated Reader Model Classroom," recognizing the plaintiff's ability to help students focus on the goal of improving their reading skills.

During the 2012-2013 school year, her third year of probationary employment, the plaintiff became pregnant. The plaintiff notified Barkley of her pregnancy on or about September 7, 2012, and Barkley congratulated her. The plaintiff informed Barkley that she would be requesting maternity leave from April 1, 2013 to May 24, 2013. The plaintiff and Barkley further discussed the plaintiff's leave in January of 2013. Barkley informed the plaintiff that her leave would be FMLA leave, and referred the plaintiff to bookkeeper Ro Deberry to complete the necessary paperwork. The plaintiff was eligible for FMLA leave, as she had been employed by the Board for more than twelve months and had worked

more than 1,250 hours in the twelve months preceding her leave.  The plaintiff submitted her request for leave, which was approved by the Board on or about February 28, 2013.  Regarding her FMLA leave, the plaintiff was told by Terry Bennett, a central office employee, that FMLA was intended to protect the plaintiff's job while she was on leave.  For the relevant time period, John Jones ("Jones") has been the Coordinator of Personnel for Madison City Schools.  He testified that he commonly processed requests for FMLA leave related to pregnancy and has not known anyone to denied FMLA leave for pregnancy.  He testified that it has not been suggested to him that action be taken against a teacher applying for pregnancy-related FMLA leave, including the plaintiff.

The plaintiff began her FMLA leave on April 1, 2013, and her daughter was born on April 16, 2013.  The plaintiff also had accrued paid leave, so she was paid for the entirety of her FMLA leave.  (Doc. 27, ¶ 8).  During the plaintiff's FMLA leave, on May 23, 2013, Barkley and McKay visited the plaintiff's home to provide her with a letter, signed by Superintendent, Dr. Dee O. Fowler (" Fowler"), stating that "the Board has accepted my recommendation to terminate your employment with Madison City Schools."  The plaintiff's non-renewal was effective the next day, May 24, 2013, the final day of her probationary employment period with the Board.  The plaintiff's employment was terminated by the Board, and she was not restored to her prior position upon the conclusion of her

FMLA leave.  The plaintiff was informed by Barkley at that time that the reason for her non-renewal was the rezoning plan, discussed below, that resulted in a reduction in the number of teachers at Mill Creek.  The plaintiff's performance was not mentioned as a reason for her non-renewal or employment.

Following her non-renewal, the plaintiff sought and received unemployment compensation.  Pam Webb ("Webb"), the Board's payroll manager, completed an Unemployment Benefit Payment Audit Form with regard to the plaintiff's claim for unemployment benefits.  On the form, Webb checked a box indicating that the plaintiff was "laid off," defined on the form as the termination of employment due to "reduction in force, lack of work, company downsized."  Webb indicated in her affidavit that she considers any non-renewal to be the equivalent of an employee being laid off by the Board.

At the time plaintiff's employment was terminated, the Board retained at least four similarly situated non-tenured teachers at Mill Creek who were not pregnant, had not recently given birth, and had not taken FMLA leave.  After plaintiff's non-renewal in May 2013, the Board hired at least one new teacher in the fall of 2013, Rebecca Wilson.  (Doc. 31, ¶ 19).  The plaintiff filed a pregnancy discrimination claim with the EEOC on or about October 28, 2013.  The EEOC issued the plaintiff a Right to Sue letter on August 22, 2014.

**B. *The Rezoning Plan and its Effect on Mill Creek Teachers***

In 2012, the school system planned a rezoning of elementary schools, which was expected to reduce the number of teachers needed at Mill Creek for the 2013-2014 school year.  The proposed rezoning was approved by the Board early in 2013.  Fowler informed Barkley at a staffing meeting in April 2013 that the rezoning plan was projected to result in the need for eight fewer teachers at Mill Creek.  To reach that number, four teachers were transferred to other schools within the Madison City School system, one teacher resigned, and three teacher's employment was non-renewed.  The total number of teachers for the entire school system was not reduced, however, as the number of students in the system did not decline.

Testimony indicates that all non-tenured teachers could have been chosen for non-renewal.  During the 2012-2013 school year, there were thirteen non-tenured teachers at Mill Creek teaching Kindergarten through sixth grade, including resource teachers.[1]  Two non-tenured teachers took pregnancy leave during the 2012-2013 school year: Kristina Maples (the plaintiff) and Jessica Latham ("Latham").[2]  Although Latham tendered her letter of resignation on May 10, 2013, Barkley was aware as early as April, before the staff meeting, of

---

[1]  This includes a teacher classification of "DD," the meaning of which is unclear.

[2]  Katie Machado also took pregnancy leave during the 2012-2013 school year, but it was determined that she obtained tenure midyear and, therefore, was not eligible for non-renewal. Thus she was not similarly situated to the plaintiff.

Latham's intent to resign at the end of the 2012-2013 school year.  Paige Wilson, another non-tenured teacher at Mill Creek, was transferred to another school within the Madison City district.  (Barkley Depo., p. 52).  Other third-year non-tenured teachers at Mill Creek[3], Taylor Dinges, Emily Ortiz, Kimberly Pratt, Traci Stewart, and Tosha Swearingen[4], who did not become pregnant or take pregnancy leave during the 2012-2013 school year, all retained their positions at Mill Creek.

During the April staffing meeting, Barkley discussed for non-renewal the following teachers: Kristina Maples (the plaintiff), Katie Machado (who, unknown to Barkley, had obtained tenure), Dr. Julie Hosier, and Amara Alexander.  Alexander was added to the discussion only after it was discovered that Machado had obtained tenure midyear.  Machado and the plaintiff had taken pregnancy leave during the 2012-2013 school year; Hosier and Alexander had not.  Barkley recommended to Fowler that the plaintiff, Hosier, and Alexander not be renewed for employment the following school year.  Fowler presented the recommendations to the Board, and the Board approved them.  Ultimately, the plaintiff, Hosier, and Alexander were non-renewed at the end of the 2012-2013 school year.  Fowler

---

[3]  The Faculty List does not indicate what year of probationary teaching a non-tenured teacher is on during any particular school year.

[4]  Tosha Swearingen took pregnancy leave during the 2011-2012 school year (Doc. 28-3, pp. 39-43), the school year before plaintiff did so in 2012-2013.  Sara Philips, a teacher who was tenured during the 2012-2013 school year, also took pregnancy leave during the prior 2011-2012 school year (Doc. 28-4, p. 6), but it is unclear whether she was tenured at the time she took pregnancy leave.  (Doc. 28-4, p. 2).

testified that, to his knowledge, no teacher positions had to be eliminated from the *overall* staffing of Madison City Schools because the number of students in the district remained roughly the same.   (Fowler Depo., p. 52).   Alexander was "rehired" during the summer of 2013, almost immediately after her non-renewal, and Barkley recommended that Hosier be interviewed for rehire in June of 2013, less than a month after her non-renewal.  The plaintiff was the only non-renewed probationary teacher who was not at least considered for rehire and the only one who had taken pregnancy leave during the 2012-2013 school year.   After the rezoning plan was implemented, in the fall of 2013, Mill Creek hired at least one new teacher, Rebecca Wilson.

### C. Student Testing and Expert Testimony

Students in the third grade at Mill Creek take the Alabama Reading and Math Test ("ARMT") and Dynamic Indicators of Basic Early Literacy Skills ("DIBELS") assessments.  The ARMT is given once at the end of the school year, and the DIBELS assessment is given three times throughout the year.

### 1. ARMT

On the ARMT, each student receives a scaled score which is then converted into an "achievement level" score of 1, 2, 3, or 4.  (Vasile Depo., pp. 123-24).  The highest possible achievement level score on the ARMT is a 4.  An achievement level score of 1 indicates that the student does not meet academic content

standards, and an achievement level score of 4 indicates that the student exceeds academic content standards. (Id. at 124-25). The only scores provided in this case are the scores that already have been converted from a raw score to a scaled score and then to an achievement level score. The school uses the achievement level scores to obtain the grade-level average for students as well as classroom averages.

In the 2011-2012 school year (plaintiff's second year at Mill Creek), the plaintiff's class received an average score of 3.14 on the ARMT math assessment and received an average score of 3.36 on the ARMT reading assessment. (Doc. 28-4, p. 47). The average ARMT score for all third-grade students at Mill Creek was a 3.50 on the math assessment and 3.63 on the reading assessment. (Id.) The plaintiff's class received the lowest average score on both the math and reading assessments for the 2011-2012 school year ARMT. [5] (Id.) During the next school year (2012-2013), the plaintiff was a "team teacher" with Machado. Their teaching arrangement was that the plaintiff taught reading to both her and Machado's classes and Machado taught math to both classes. Accordingly, both classes' ARMT reading scores would be reflective of the plaintiff's teaching, but the math scores would be reflective of Machado's. On the 2012-2013 ARMT

---

[5]   Although Barkley claims that these scores were a factor in her decision to recommend that the plaintiff's employment be non-renewed, the plaintiff argues that there is no evidence that Barkley evaluated the test scores of the plaintiff's students prior to recommending the plaintiff's non-renewal. There is no evidence that Barkley told plaintiff, verbally or in writing, that the scores factored into her non-renewal. The plaintiff does not, however, dispute the defendant's account of her students' scores.

assessment, the plaintiff's students received an average score of 3.52 in reading, and Machado's students received an average score of 3.76 in reading.  (Doc. 28-4, p. 46).  The overall third-grade average in reading was 3.69.  (Id.)

## 2.  DIBELS

The DIBELS assessment "measures a student's early acquisition of skills needed to learn how to read."  (Doc. 27, ¶ 27).  The DIBELS assessment is given three times a year and measures word fluency and benchmark levels for the beginning, middle, and end of the school year.  Students receive a score of "B" if they meet the benchmark being tested.  Students who test in the mid-range with regard to benchmark receive a score of "S," indicating the need for strategic intervention, and students who test further off the benchmark receive a score of "I," indicating the need for intensive intervention.  The goal for teachers is to work toward all students receiving a "B" on the DIBELS assessment.

During the 2010-2011 school year (plaintiff's first year at Mill Creek), seventeen of the plaintiff's students received a score of "B," one student received a score of "S," and one student received a score of "I" at the beginning of the year. (Doc. 28-4, p. 50).  On the mid-year assessment, eighteen of the plaintiff's students scored "B," one scored "S," and one scored "I."   On the year-end assessment, seventeen students scored "B," two scored "S," and one scored "I."  (Id.)  For the 2011-2012 school year (plaintiff's second year at Mill Creek), the plaintiff had

eighteen students score "B," one scored "S," and one scored "I" on the beginning-of-the-year assessment.  (Id.)  On the mid-year exam, seventeen students scored "B," two scored "S," and one scored "I."  On the end-of-year exam, eighteen students scored "B," four scored "S," and 1 scored "I."[6]  (Id.)  During the 2012-2013 school year (plaintiff's third and final year at Mill Creek), seventeen of the plaintiff's students scored a "B" on the DIBELS assessment at the beginning of the year, three scored "S," and two scored "I."  (Id.)  On the mid-year assessment, seventeen students scored "B," four scored "S," and one scored "I".  (Id.)  At the end of the year, thirteen of the plaintiff's students scored "B," nine scored "S," and no students scored "I."[7]  (Id.)

It is unclear from the charts provided whether the students being tested at each point in a given year were the *same* students throughout the year.  It is clear from looking at the total number of students taking each test that the plaintiff gained one student between the beginning-of-year and mid-year exam during the 2010-2011 school year.  She gained three students between the mid-year and end-of-year exam during the 2011-2012 school year.  However, the plaintiff had

---

[6]   The court notes that the year-end assessment represents an increase of three students over the mid-year assessment.  The record does not reveal when these students joined plaintiff's class or how long they were taught by plaintiff before the year-end assessment occurred.

[7]   Again, the defendant asserts that the DIBELS scores of the plaintiff's students was a factor used in recommending the plaintiff's employment be non-renewed.  The plaintiff disputes that assertion and states that she was told she was non-renewed due to the rezoning plan.  She does not dispute the information provided by the defendants regarding the DIBELS assessment or the scores received by her students.

twenty-two students for the entirety of the 2012-2013 school year.  Whether there was any other student movement, i.e. one student left the class and was "replaced" by a new student, is unclear.

Despite fairly consistent scores from the plaintiff's students for the 2010-2011, 2011-2012, and 2012-2013 school years, Barkley did not recommend the plaintiff's non-renewal after the first two school years the plaintiff taught.  At no time during the plaintiff's employment did Barkley or McKay express to the plaintiff that her students' scores were deficient or that the administration was dissatisfied with the scores.  The plaintiff also did not receive written notice that her students' scores were insufficient.

### 3.  Experts

Both parties have retained experts.  The Board retained as its expert Dr. Catherine Vasile ("Vasile"), the Director of Instruction for Elementary and P-8 for Huntsville City Schools.  Vasile opined in her deposition that performance of students on a "normed referenced test" is one indication of the effectiveness of the students' teacher.  (Vasile Depo., pp. 109-110).  Vasile noted in her deposition that the plaintiff's class had the lowest composite achievement score on the ARMT for each of the three years the plaintiff taught at Mill Creek.  (Vasile Depo., pp. 125-27).  She also noted that, on the 2012-2013 DIBELS assessment, the number of students in the plaintiff's class who reached the benchmark declined from

seventeen on the first assessment to thirteen on the final assessment.[8]  The number of students needing strategic intervention increased from three to nine, and the number of students needing intensive intervention decreased from two to zero. Vasile opined that a number of data points should be used when evaluating a teacher's effectiveness in the classroom and determining whether to renew the contract of a probationary teacher.  In her written findings, however, Vasile noted that none of the tests given to students "are primarily designed as to serve as an evaluation tool for teachers."  (Doc. 28-4, p. 42).

The plaintiff retained Dr. Angela Ruffin Williams ("Williams"), who is a former employee of Huntsville City Schools and currently works as a lecturer in the subjects of curriculum and instruction for the University of Alabama at Huntsville.  Williams opined that ARMT and DIBELS assessment scores should be used as part of the evaluation of teacher performance.  (Williams Depo., pp. 150-152).  At the time of her deposition, Williams stated that she was not aware of any evaluation measures other than ARMT and DIBELS that may have been used to evaluate the plaintiff's performance.  (Id. at 181).  According to Williams' summary of her findings, there is not a statistically significant difference between the plaintiff's students' test scores compared with the students of other third-grade

---

[8]   It is not clear when the end-of-year DIBELS assessment is administered.  Therefore, it is possible that the end-of-year assessment had not been administered or scored at the time of the April 2013 staffing meeting during which non-renewal was discussed.  It also is possible that the plaintiff already was out on leave at the time her class reviewed for and took the end-of-year DIBELS exam.

teachers.  (Doc. 28-9, p. 56).  Williams also asserts that in order to determine a true comparison between the teachers' test scores, more information would be needed – such as which other teachers, if any, were new or novice teachers, as compared with experienced teachers.  (Id.)  Williams noted that, when the plaintiff's students took end-of-year tests at the end of the 2012-2013 school year, a substitute teacher had taken over for the plaintiff, as she was on leave.  (Id.)  Finally, Williams cited the DIBELS technical manual to state that the DIBELS assessment, specifically, has not been validated for use to evaluate teachers and it is not appropriate to use DIBELS test scores when making decisions regarding teacher evaluation.  (Doc. 28-9, p. 57).

## DISCUSSION

The plaintiff asserts in her First Amended Complaint that the Board violated her rights under the Family and Medical Leave Act and Title VII of the Civil Rights Act.  The plaintiff's claims will be discussed in turn.

## FAMILY AND MEDICAL LEAVE ACT

The plaintiff asserts in Counts I and II that the Board interfered with her rights under the Family and Medical Leave Act ("FMLA").  Eligible employees are entitled under the FMLA to twelve workweeks of unpaid leave per year for, among

other things, "the birth of a son or daughter of the employee and in order to care for such son or daughter." 29 U.S.C. § 2612(a)(1). Upon return from leave, the eligible employee is entitled to be restored to her previous position or to a position that is equivalent in terms of "employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1). Employers are prohibited from interfering with the eligible employee's exercise of her rights under the statute. 29 U.S.C. § 2615. Two types of claims arise under the FMLA: (1) interference claims, where an employer denies or limits the employee's right to such leave, and (2) retaliation claims, where an employer retaliates against an employee who requests or takes such leave. See Penaloza v. Target Corp., 549 Fed. Appx. 844, 847 (11th Cir. 2013). Count I of the plaintiff's First Amended Complaint alleges a claim for interference with her FMLA rights because she was not restored to her position or an equivalent position upon her return from leave. Count II of the First Amended Complaint alleges a claim for FMLA retaliation, asserting that she was not renewed for employment in retaliation for having taken FMLA leave. The defendant moves to dismiss the plaintiff's claims that the Board improperly interfered with her FMLA rights and retaliated against her for exercising her FMLA rights.

## A. *FMLA Interference*

To state a claim for interference with FMLA leave, a plaintiff must demonstrate that she was entitled to a benefit under the FMLA, which was denied. Drago v. Jenne, 453 F.3d 1301, 1306 (11th Cir. 2006); 29 U.S.C. § 2615(a)(1) (prohibiting any employer from "interfer[ing] with, restrain[ing] or deny[ing] the exercise of or the attempt to exercise, any right provided under" the FMLA). Refusing to authorize FMLA leave is not the only way in which an employer can interfere with an employee's rights under the Act. Section 2614 also requires that employees who take leave under the Act are entitled, upon their return, to be restored to the employee's prior position or an equivalent position "with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1).

In the instant case, the plaintiff does not dispute that her request for leave under the FMLA was approved and she was allowed to take her leave. Instead, the plaintiff asserts that she was denied her right to be reinstated to the same or an equivalent position. Although an employee's right to reinstatement is not absolute, and "an employer can deny reinstatement if it can demonstrate that it would have discharged the employee had [s]he not been on FMLA," Martin v. Brevard County Public Schools, 543 F.3d 1261, 1267 (11th Cir. 2008), "if an employee is not reinstated, the employer bears the burden of proving that the employee was

discharged for independent reasons that were unrelated to the employee's leave." Schaaf v. Smithkline Beecham Corp., 602 F.3d 1236, 1241 (11th Cir. 2010); citing Parris v. Miami Herald Publ'g Co., 216 F.3d 1298, 1301 n. 1 (11th Cir. 2000).

The fact that the plaintiff in the instant case was not restored to her position or an equivalent position upon completion of her FMLA leave is not in dispute. Instead, the Board contends that the same decision not to renew the plaintiff's employment with the Board would have been made if the plaintiff had not taken FMLA leave because the plaintiff's employment was non-renewed for deficient performance. The Board bears the burden of proving this allegation. To support its claim the Board cites Schaaf, the Eleventh Circuit case, as well as a case from the Middle District of Florida. In those cases, however, the defendants relied upon verifiable records of performance deficiency such as meetings, complaints from the plaintiff's subordinates, and documented instances of excessive tardiness and absences. See Schaaf, 602 F.3d 1236; Barron v. School Bd. of Hillsborough County, 3 F. Supp. 3d 1323 (M.D. Fla. 2014). In those cases, the performance deficiencies were not genuinely disputed by the plaintiff. Where the defendant employer is asserting this affirmative defense, summary judgment is proper only when the employer to show there is no genuine issue of fact regarding the deficient performance.

The Board argues that the decision not to renew the plaintiff's employment had nothing to do with the fact that she took FMLA leave and everything to do with the fact that, if the plaintiff was not informed of her non-renewal by the last day of the school year, she automatically would obtain tenure.  The Board asserts that the decreased need for teachers at Mill Creek due to the rezoning plan made it necessary to non-renew three teachers, and that the plaintiff would have been on that list regardless of the fact that she took FMLA leave.  According to the defendant, the decision not to renew the plaintiff's employment was "[b]ased on Maples' negative interactions with parents, requests by parents and other teachers at Mill Creek that their children not be placed in Maples' classroom, lower ARMT scores for Maples' students than the other third grade teachers' scores, and clear evidence of reading regression for Maples' students based on the DIBELS assessment."  (Doc. 29, pp. 21-22).

Barkley testified in her deposition that, due to the rezoning of the Madison City school district, eight teacher units would need to be removed from Mill Creek Elementary.  Five of those units were removed through transfer or resignation of teachers (Jessica Latham resigned her position), but three units had to be removed by either terminating tenured teachers or non-renewing probationary teachers. Those decisions were made at the staffing meeting in April 2013, pending approval by the Board.  According to Barkley, the employees discussed for termination or

non-renewal were Dr. Julie Hosier, Kristina Maples, and Amara Alexander.  Katie Machado originally was in the termination discussion, but has dropped from the discussion when it was determined that she had obtained tenure.  (Barkley Depo., pp. 37, 52-53).  Both Machado and the plaintiff had taken pregnancy leave during the 2012-2013 school year.  (Id. at 53).  Jessica Latham also had taken pregnancy leave during the 2012-2013 school year, but she had informed Barkley of her intent to resign prior to the April staffing meeting.  (Id. at 53).

Barkley testified that the decision not to renew the plaintiff's employment was based on the low test scores of the plaintiff's students, complaints the school had received from parents, and complaints by other teachers.  However, when asked at deposition, Barkley could not name any parent who had complained about the plaintiff, and she testified that there was no record available to reflect those complaints.  (Id. at 76-77).  Allegedly, parents had complained about the plaintiff's tone of voice being harsh, condescending, and not nurturing.  Barkley testified that she did not observe the plaintiff being harsh, condescending, or not nurturing when she observed the plaintiff's classroom.  (Id. at 77).  Barkley also could not recall during which school year she received complaints from parents regarding the plaintiff, but stated that she received complaints during the plaintiff's "three years of employment" at Mill Creek.  (Id. at 79-80).

Barkley testified that other third grade teachers, specifically Ellen Little ("Little") and Cheryl Campbell ("Campbell") complained about the plaintiff's lack of collaboration with the other teachers during the spring of the plaintiff's second year of teaching at Mill Creek.  (Id. at 82).  However, there is no record of these complaints, and Barkley did not ever tell the plaintiff that "her colleagues had complained about her lack of collaboration."  (Id. at 82, 84).  Moreover, it was after these alleged complaints that Barkley completed a written teacher evaluation of the plaintiff on May 6, 2013, which stated that "Mrs. Maples collaborates with her colleagues to integrate literacy instruction throughout the curriculum;" and that the plaintiff "collaborates with grade level and with the vertical communications team." (Barkley Depo., pp. 116-17).  Barkley also testified that other teachers did not want their own children in the plaintiff's class, but could not recall during which school year this occurred.  (Id. at 85).  Barkley testified that toward the end of the 2011-2012 school year she held a meeting with the plaintiff regarding the fact that parents had complained and about the fact that the plaintiff needed to make sure she worked with others.  (Id. at 87).  She testified that McKay would have been present for the meeting, but that there is no written record of the meeting.  (Id. at 87-88).  The plaintiff denies that she was ever approached by either Barkley or McKay about complaints by parents.  Barkley testified that she never gave the plaintiff a written reprimand regarding her performance at Mill

Creek.  (Id. at 92).  Indeed, Barkley and McKay selected plaintiff to be a "grade-level teacher" and a member of the Leadership Team during the 2012-2013 school year.

Another reason cited by the defendants for the non-renewal of the plaintiff's employment was that the plaintiff's students scored lower on standardized tests than students in the other third-grade classes.  Barkley testifies that she informed the plaintiff that her ARMT scores were too low in data meetings held with all of the teachers.  (Id. at 159).  She also stated, however, that she did not ever tell any teacher that, if the teacher's ARMT scores did not improve, that teacher would be terminated.  (Id. at 162).  Barkley testified that she did not recall discussing with the plaintiff the need to increase her test scores and that she did not tell the plaintiff that she would be terminated if her scores did not improve.  (Id. at 163).

Vice Principal McKay also was deposed in the course of this suit.  She testified that, when evaluating the probationary teachers, she and Barkley discussed the plaintiff's test scores as well as her manner with parents, students, and colleagues.  (McKay Depo., p. 40).  McKay also testified that teachers did not want their own children to be in the plaintiff's classroom, but could not recall which teachers or in what year any such requests were made.  (Id. at 47-48).  McKay stated in her deposition that, when a new third-grade teacher was hired during the 2012-2013 school year, five or six students from each third-grade class

were transferred to the class of the new teacher.  (Id. at 49).  According to McKay, the students that left the plaintiff's classroom were all volunteers.  (Id.)   The plaintiff and Machado were the only third-grade teachers "team-teaching" during the 2012-2013 school year, which meant that students in those teachers' classes had to change classrooms during the day.  (Id.)  Although McKay seems to believe that students pulled out of the plaintiff's classroom due to the quality of her teaching, the plaintiff's testimony contradicts that.  Maples testified that, when this occurred, she and Machado met with McKay and were assured that "they don't want to be pulled out because of you.  Some of them want to be pulled out because they don't like changing classes . . . [a]nd then "B," one of the children doesn't want to be in the class with "S," . . . [b]ut don't worry about it; it's nothing against you guys."  (Maples Depo., pp. 143-144).

McKay stated in her deposition that she could not identify any particular parent that complained about the plaintiff.  (Id. at 65-66).  She also could not identify the particular school year or years during which complaints about the plaintiff were received, saying instead that "[p]robably there were more complaints the third year, but there were complaints."  (Id.)  When asked whether parents ever complained to her about the tone of voice the plaintiff used, McKay answered, "I would say yes, . . . but I couldn't tell you when or who."  (Id. at 67).  McKay also said she "probably" told the plaintiff that parents had raised various complaints

about her, but she could not answer with certainty.  (Id. at 69).  McKay did state that she spoke with the plaintiff about the tone of voice the plaintiff used during a parent conference that McKay sat in on during the 2011-2012 school year.  (Id. at 69-70).  She testified that she did not believe the way the plaintiff interacted with the parent was appropriate.  (Id. at 69).  McKay cannot, however, remember who the parent was, and there would be no record of the conference.  (Id. at 71).  McKay also stated that she did not notify the central office that parents were complaining about the plaintiff and that she did not recall making any written notes about the complaints.  (Id.)

McKay testified that she received complaints about the plaintiff's collaboration with the other teachers from the plaintiff's colleagues, Campbell and Little.  (Id. at 73-74).  McKay stated that Campbell and Little did not want to team-teach with the plaintiff, saying that "[t]hey're a pretty tight group.  I mean, they get together and they talk all the time.  And she wasn't a part of that.  And they didn't want to -- I mean, it would be more like that."  (Id. at 74).  When asked whether she was referring to the plaintiff not communicating with regard to the planning process, McKay answered, "[w]ell, they just didn't want to work with her -- I mean, team with her."  (Id.)  McKay did not recall any other complaints from colleagues about the plaintiff, and that there is no record of any of the complaints. (Id. at 76).  McKay did not recall ever telling the plaintiff that her colleagues had

complained about her or meeting with the plaintiff to discuss the complaints.  (Id. at 77-78).  The only times McKay recalls discussing the plaintiff's performance with her were after the parent conference in which McKay felt the plaintiff's tone was inappropriate, a meeting to discuss with the plaintiff and Machado punishing students for failing to bring their pencils and other supplies when they changed classrooms, and to discuss which member of the "teaching team" should call parents about discipline issues.  (Id. at 80-81).  McKay does not recall anything ever being given to the plaintiff in writing.  (Id. at 81).

The defendant's brief, however, does not point to any documented evidence regarding deficient performance by the plaintiff.  In fact, there are no written records of complaints regarding the plaintiff's teaching by parents or other teachers.  This absence of documented complaints makes this case different from Schaaf and Barron.  In each of those cases there was clear documentation of deficient performance.  In Schaaf, the record indicates that three of the plaintiff's subordinates – Liz Murray, Stewart Miller, and Jose Castrillo – lodged complaints against the plaintiff.  Schaaf v. Smithkline Beecham Corp., 602 F.3d 1236, 1238 (11th Cir. 2010).  The defendant in Schaaf also interviewed the plaintiff's other subordinates, who corroborated the testimony of the subordinates that filed the complaints.  The plaintiff filed no evidence to contradict the testimony of her subordinate employees.  The plaintiff in Barron also was a probationary teacher.

<u>Barron</u>, 3 F. Supp. 3d 1323, 1326 (M.D. Fla. 2014).   There, the plaintiff's probationary period was extended "based on several concerns raised in Barron's performance evaluations."   (<u>Id.</u>)   Following the extension, the plaintiff's evaluations continued to document unsatisfactory performance, and the plaintiff's employment was terminated at the end of the school year. (<u>Id.</u> at 1326-27).  In the instant case, the plaintiff's evaluations make no mention of unsatisfactory performance and, indeed, state that she collaborated with colleagues, contrary to the position now taken by the Board.

The only arguably deficient performance in the instant case that is supported by documented evidence is the plaintiff's test scores.  There is a dispute between the experts, however, regarding the statistical relevance of the discrepancy between the scores of the plaintiff's students and those of other third-grade classes.  The score information alone also fails to take into consideration the number of special education students the plaintiff had in comparison to other third-grade classes and whether the plaintiff had the same students in her class from the beginning to the end of the year, among other variables.

Accordingly, the evidence put forth by the defendant is not sufficient to show that the plaintiff would have been terminated even had she not taken FMLA leave.  To be entitled to summary judgment on this affirmative defense, the defendant must establish that there is no genuine dispute of fact about it as the

basis for the Board's decision not to renew her contract.   The evidence of performance deficiency on the part of the plaintiff is far from undisputed.  Because there are genuine issues of fact as to whether plaintiff was non-renewed due to performance problems, the defendant's motion for summary judgment as to Count I, the plaintiff's FMLA interference claim, is due to be denied.

### B.  *FMLA Retaliation*

To establish a claim for retaliation under the FMLA, a plaintiff must demonstrate that the employer took an adverse employment action against her, motivated by a retaliatory animus and which was causally connected to her use of the FMLA.  Penaloza v. Target Corp., 549 Fed. Appx. 844, 847 (11th Cir. 2013). To establish a *prima facie* claim of FMLA retaliation, the plaintiff must show that: "(1)[s]he availed [her]self of a protected right under the FMLA, (2) [s]he suffered an adverse employment decision; and (3) there is a causal connection between the protected activity and the adverse employment decision."   Wascura v. City of South Miami, 257 F.3d 1238, 1248 (11th Cir. 2001), quoting Parris v. Miami Herald Publishing Co., 216 F.3d 1298, 1301 (11th Cir. 2000).  If the plaintiff succeeds in setting out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), See Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1297

(11th Cir. 2006).  This is a relatively light burden of articulation, not persuasion.  If the defendant is able to meet this hurdle, the burden shifts back to the plaintiff to show that the proffered reason for the adverse employment action was pretextual. See Id.

### 1. *Prima Facie* Case

It is not disputed that the plaintiff availed herself of leave to which she was entitled under the FMLA and suffered an adverse employment action in the form of non-renewal of her employment.  The defendant asserts that the plaintiff was non-renewed due to the necessary loss of three teaching units at Mill Creek and the plaintiff's poor performance.  To prove a *prima facie case*, the plaintiff must show that there was a causal connection between the protected activity of taking FMLA leave and the adverse employment action of non-renewal of the plaintiff's employment.

The Eleventh Circuit has discussed the requirement of causal connection as follows:

> To establish the causal connection element, "a plaintiff need only show 'that the protected activity and the adverse action were not wholly unrelated.'"  Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1354 (11th Cir. 1999) (quoting Simmons v. Camden County Bd. of Educ., 757 F.2d 1187, 1189 (11th Cir. 1985)).  In order to show the two things were not entirely unrelated, the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action.  See Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993); Raney v. Vinson

Guard Serv., Inc., 120 F.3d 1192, 1197 (11th Cir. 1997) ("[I]n a case
involving a corporate defendant the plaintiff must show that the
corporate agent who took the adverse action was aware of the
plaintiff's protected expression. . . ."). That requirement rests upon
common sense. A decision maker cannot have been motivated to
retaliate by something unknown to him. As with most facts, the
defendant's awareness can be established by circumstantial evidence.
See Goldsmith, 996 F.2d at 1163.

The general rule is that close temporal proximity between the
employee's protected conduct and the adverse employment action is
sufficient circumstantial evidence to create a genuine issue of material
fact of a causal connection. See Gupta, 212 F.3d at 590; Bechtel
Constr. Co. v. Secretary of Labor, 50 F.3d 926, 934 (11th Cir. 1995)
("Proximity in time is sufficient to raise an inference of causation.")
However, there is this exception: temporal proximity alone is
insufficient to create a genuine issue of fact as to causal connection
where there is unrebutted evidence that the decision maker did not
have knowledge that the employee engaged in protected conduct. See
Clover, 176 F.3d at 1355-56.

Brungart v. BellSouth Telecommunications, Inc., 231 F.3d 791, 799 (11th Cir.

2000).

The plaintiff requested leave from April 1, 2013 to May 24, 2013, and she

began her FMLA leave on April 1, 2013. Barkley was aware of this fact, as was

the Board, which approved her request for FMLA leave on February 28, 2013.

Barkley and McKay delivered to the plaintiff a non-renewal letter on May 23,

2013, which also was approved by the Board. The temporal proximity alone is

sufficient to show that the plaintiff taking leave and the adverse employment action

were not entirely unrelated. Furthermore, there is no argument that any

decisionmaker involved in deciding the plaintiff's non-renewal did not know that the plaintiff had taken leave under FMLA.  The plaintiff's leave approval letter and her non-renewal letter both were signed by Fowler, the Superintendent of Madison City Schools.  (Doc. 28-1, pp. 66, 70).  It also is not disputed that the plaintiff discussed her need to take leave with Barkley, and that Barkley delivered the plaintiff's termination letter to her.  Certainly Fowler and Barkley were fully aware that the plaintiff had taken FMLA leave.

The defendant argues, however, that temporal proximity is not sufficient to create a causal connection between the protected act and the adverse employment action.  The defendant cites in support of the position Gamba v. City of Sunrise, in which the Eleventh Circuit found that "[w]here the employer produces *significant evidence of the employee's poor performance*, it is not enough that the request for leave and the termination are closely related in time."  157 Fed. Appx. 112, 113 (11th Cir. 2005) (emphasis added), citing Wascura v. City of South Miami, 257 F.3d 1238, 1248 (11th Cir. 2001).  In Gamba, the employer presented "numerous documented instances of unsatisfactory job performance," which were "well-supported by the record."  Gamba, 157 Fed. Appx. at 113.  The plaintiff in Gamba also did not dispute that he had received multiple written notices of deficient job performance.  Id.  Unlike Gamba, the record presented in the case at bar includes no documented evidence of poor performance.  As explained above, the only

evidence of poor performance by the plaintiff is found in the deposition statements of Barkley and McKay, all of which are disputed by the plaintiff's own testimony. Such evidence does not constitute "significant evidence of poor performance." Furthermore, to the extend the defendant relies on the plaintiff's students' test scores, the plaintiff's expert contends that her student's scores, although lower than other classes, are not statistically significant with regard to the plaintiff's performance.

The defendant also cites Wu v. Southeast-Atlantic Beverage Corp., in which the United States District Court for the Northern District of Georgia stated that "[a]ny inference of retaliatory intent otherwise created by a short lapse of time can be dispelled when intervening factors are established."  321 F. Supp. 2d 1317, 1337 (N.D. Ga. 2004), citing Robinson v. AFA Serv. Corp., 870 F. Supp. 1077, 1084 (N.D. Ga. 1994) (finding absence of causal link, despite termination one day after employer learned of plaintiff's discrimination charge, where plaintiff had been warned numerous times regarding her job performance).  Wu is so distinguishable from the case at bar that it is unhelpful in evaluating the facts at issue here.

In Wu, the plaintiff had been notified in writing that his performance was deficient and given a timeframe within which he was instructed to improve job performance.  321 F.Supp. 2d at 1326.  The plaintiff also received notes on his

annual review regarding improvements he needed to make on job performance.  Id.

All of these actions took place prior to the plaintiff in Wu filing an EEOC charge.

The record in Wu also contains a list of written notes that were kept in the

plaintiff's file.  Id. at 1327.  Although the plaintiff in Wu disputed the accuracy of

the notes in his file, he did not dispute the fact that they existed.  Id. at 1328.  The

contrast to the instant case is stark.  The defendant relies upon deposition evidence

in which the deponents, Barkley and McKay, admit that no written records of the

plaintiff's performance exist and in which they only vaguely assert that the

plaintiff was verbally notified of deficient performance prior to being fired.  There

certainly are no records of a meeting during which the plaintiff's performance was

discussed.  Furthermore, all of the allegations set out in Barkley's and McKay's

depositions are disputed by the plaintiff, who insists that she never was informed

that her performance was deficient.  The plaintiff denies that her performance was

deficient.  The evidence relied upon by the defendants simply is not sufficient to

establish "intervening factors" which may serve to refute the temporal proximity

presumption of causation.

Finally, the defendant cites Booth v. Birmingham News Co., 704 F.Supp.

213, 216 (N.D. Ala. 1988), in which the court notes evidence that clients of the

employer objected to the plaintiff being assigned to certain accounts.  Yet, again,

no such evidence is presented for the case at bar.  Barkley and McKay testified in

their depositions that teachers and parents objected to students being placed in the plaintiff's classroom, but there is no written evidence of such requests or complaints, nor is there independent testimony from those teachers or parents. There is certainly nothing that constitutes "significant evidence of poor performance," such that temporal proximity should be disregarded as a factor showing causation.

Accordingly, the plaintiff has proved her *prima facie* case for FMLA retaliation. It is not disputed that she availed herself of FMLA leave, as was her right, and that she suffered an adverse employment action in the form of non-renewal of her employment. Furthermore, the plaintiff has shown a causal connection between her use of FMLA leave and the adverse employment action because she was terminated during her FMLA leave.

### 2. Legitimate, Nondiscriminatory Reason

When a plaintiff establishes a *prima facie* showing of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action. The defendant's burden is light, one of production, not of proof. In the instant case, the defendant asserts that the plaintiff's employment was non-renewed because Mill Creek had to cut three teaching units due to the rezoning of Madison City Schools. According to the defendant, the plaintiff was chosen as one of those units because parents and other teachers

complained about her, she had low reading test scores, and was not tenured.  Once the defendant presents a legitimate, non-retaliatory reason for the adverse employment action, the burden shifts back to the plaintiff to show that the stated reason was a pretext for retaliation.  The defendants have sufficiently stated a legitimate, non-retaliatory reason to shift the burden back to the plaintiff.

### 3. Pretext

To show pretext, the plaintiff must present evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision."  Hurlbert v. St. Mary's Health Care System, Inc., 439 F.3d 1286, 1298 (11th Cir. 2006) (internal quotations omitted), quoting Chapman v. Al Transp., 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*), quoting in turn Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997).  Pretext may be shown "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  Jackson v. State of Alabama State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005), quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256, 101 S. Ct. 1089, 1095, 67 L. Ed. 2d 207 (1981).

The plaintiff has presented sufficient indirect evidence[9] of pretext to create a genuine issue of fact precluding summary judgment.  The plaintiff's evidence, viewed favorably to her, tends to show that the proffered reasons for the plaintiff's termination were not credible.  The plaintiff addresses the argument that her test scores were lower than the scores of other third-grade teachers by pointing to the findings of her expert witness.  The plaintiff's expert, Williams, determined in her Summary of Findings that "[t]here were no statistical significant differences in the OSAT-8, ARMT-Reading, and ARMT-Math scores of Maples as compared to other third grade teachers . . . Though there are differences in the scores across all measures, the differences are not statistically significant."  (Doc. 28-9, p. 56).  As to the defendant's arguments that the plaintiff had issues with parents and other teachers, the only evidence of any such problems is found in the depositions of Barkley and McKay, and is disputed by the plaintiff's own deposition testimony.

Perhaps more critically, the defendant's contentions are undercut by Barkley's and McKay's actions toward plaintiff before and after they discovered she was pregnant.  In May 2013, just weeks before plaintiff's non-renewal, Barkley

---

[9]   Plaintiff contends that she has presented direct evidence pretext.  Plaintiff testified that, in May of 2011, another teacher named Jennifer Monk was fired while she was on pregnancy-related leave.  (Maples Depo., pp. 75-76).  Plaintiff testified that she was discussing Monk's termination with another co-worker, Melinda Thomason, and Thomason remarked to the plaintiff that "everyone knows you don't get pregnant before you're tenured in Madison City."   (Id. at 76).  The court rejects the assertion that this is direct evidence of pretext because there is no indication that Thomason was authorized to bind the Board with her comments and that the comments were nothing more than Thomason's speculation.  The comment simply is not direct evidence of discriminatory animus attributed to the Board without inference.

wrote in plaintiff's annual evaluation that she collaborated with teachers and colleagues, and she wrote none of the critical comments relied upon now as justification for plaintiff's non-renewal. This is directly contrary to Barkley's present assertion that she was non-renewed in part because Maples did *not* collaborate with other teachers. There is no explanation for why her evaluation did not include the very things the Board now says caused her selection for non-renewal. Also, before it was discovered that Maples was pregnant, Barkley and/or McKay made her a "grade level teacher," responsible for coordinating the teachers in her grade. They appointed her to the Strategic Leadership Team for Mill Creek. Barkley even agreed in 2012 to recommend plaintiff for an assistant principal position at another school and, indeed, communicated the recommendation to the principal at that school. In both her second and third years at Mill Creek, plaintiff's classroom was named an "Accelerated Reader Model Classroom." Barkley and McKay admit that they assigned special education and difficult students to plaintiff's classroom because she was "organized" and "structured." Plaintiff was regarded as an "inclusion teacher," focused on improving the reading skills of special education students. This fact also reduces the credibility of the assertion that she was non-renewed because the reading scores of her students were lower than other third-grade teachers. Perhaps they were lower because she was given admittedly more difficult students.

Furthermore, to the extent the Board now contends that plaintiff's employment was not renewed at Mill Creek because the rezoning plan required a reduction in the number of teachers at the school, the testimony of the superintendent, Dr. Fowler, creates a genuine issue of fact. Dr. Fowler testified that while the number of teachers at Mill Creek was reduced, the overall number of teachers in the school district as a whole remained the same, as the number of students in the system remained the same. Moreover, after plaintiff was non-renewed on May 23, 2013, ostensibly due to the reduction of teacher units caused by the rezoning plan, a new teacher was hired at Mill Creek within only a few weeks, again demonstrating that the supposed need to reduce the number of teachers at the school may not be worthy of credence.

Given that the plaintiff met her initial burden of establishing a *prima facie* case for retaliation, and the requirement that the court take the evidence in the light most favorable to the nonmoving party, the plaintiff has presented sufficient evidence to establish a triable issue as to whether the defendant retaliated against the plaintiff for taking her FMLA protected leave. She has pointed to specific facts that tend to undermine the credibility of the explanation given for her non-renewal, to the point that a genuine issue of fact is presented. Accordingly, the defendant's Motion for Summary Judgment regarding Count II, the plaintiff's FMLA retaliation claim, is due to be denied.

## TITLE VII

The plaintiff asserts that the Board violated her rights under Title VII of the Civil Rights Act, as amended by the Pregnancy Discrimination Act, when her employment was terminated while she was on leave following the birth of her child.    Title VII prohibits discrimination with respect to an employee's "compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a). Specifically, the statute provides that it shall be unlawful for an employer

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

2 U.S.C. § 20000e-2(a)(1).  A plaintiff may prove a *prima facie* case of disparate-treatment discrimination by establishing that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she is qualified to do the job; and (4) her employer treated similarly situated employees who are not members of the protected class more favorably.  See Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999).

Under Title VII, a plaintiff asserting a disparate treatment claim must prove, through direct or circumstantial evidence, that the defendant had a discriminatory intent.  Denny v. City of Albany, 247 F.3d 1172, 1182 (11th Cir. 2001).  Direct

evidence establishes intent without the need for any inference or presumption.  Id. (quoting Standard v. A.B.E.L. Servs. Inc., 161 F.3d 1318, 1330 (11th Cir. 1998)). Where there is no direct evidence, the plaintiff must prove intent in accordance with the burden-shifting method first set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and further refined in Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).   Under McDonnell Douglas and Burdine, the plaintiff has the initial burden of establishing a *prima facie* case of purposeful discrimination.   Once she has done so, the defendant employer must articulate a legitimate, non-discriminatory reason (or reasons) for the adverse action taken against the plaintiff.   That is a burden only of articulation; the employer does not have to prove it was the true reason.  If such a legitimate, non-discriminatory reason is articulated, the burden of proof returns to the plaintiff to show that the reason is a pretext for discrimination.  The plaintiff must show there is a genuine issue of fact concerning whether the articulated reason is the real reason for the action taken.

In 1978, Congress passed the Pregnancy Discrimination Act ("PDA"), amending Title VII and providing that discrimination "because of sex" or "on the basis of sex" includes discrimination on the basis of pregnancy, childbirth, or related medical conditions.  42 U.S.C. § 2000e(k).  Since the passage of the PDA, it has been established that pregnancy discrimination claims are analyzed using the

same framework as other Title VII sex discrimination claims.  See Armstrong v.

Flowers Hospital, Inc., 33 F.3d 1308, 1312-13 (11th Cir. 1994).   A plaintiff

asserting disparate treatment under the PDA has the same burden of proof as one

stating a disparate treatment claim based on sex under Title VII.   The Supreme

Court recently confirmed this view:

> In our view, the [Pregnancy Discrimination] Act requires courts to
> consider the extent to which an employer's policy treats pregnant
> workers less favorably than it treats nonpregnant workers similar in
> their ability or inability to work.  And here—as in all cases in which
> an individual plaintiff seeks to show disparate treatment through
> indirect evidence—it requires courts to consider any legitimate,
> nondiscriminatory, nonpretextual justification for these differences in
> treatment.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792,
> 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  Ultimately the court
> must determine whether the nature of the employer's policy and the
> way in which it burdens pregnant women shows that the employer has
> engaged in intentional discrimination.

Young v. United Parcel Service, Inc., ___ U.S. ___, 135 S. Ct. 1338, 1344, 191 L.

Ed. 2d 279 (2015).

In the instant case, the plaintiff relies on the McDonnell Douglas/Burdine

three-step, burden-shifting framework.  Under this framework, the plaintiff carries

the initial burden of establishing a *prima facie* case of discrimination.  McDonnell

Douglas, 411 U.S. at 802.  If a *prima facie* case is shown, the defendant must

"articulate some legitimate, nondiscriminatory reason" for the adverse employment

action taken against the plaintiff.  Id.  If this is done, the plaintiff may attempt to show that the proffered reason was merely a pretext, and that the defendant's true intent was discriminatory. See Burdine, 450 U.S. at 253.

### A. Prima Facie Case

To establish a *prima facie* case in accordance with the McDonnell Douglas framework, the plaintiff must show that (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she is qualified to do the job; and (4) her employer treated similarly situated employees who are not members of the protected class more favorably.  See Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999).  It is not disputed that Maples is a member of a protected class or that she suffered the adverse employment action of having her employment non-renewed following her third year of teaching at Mill Creek.  The defendant argues, however, that the plaintiff's employment was non-renewed because she was not qualified for her position.  Also, the defendant contends that the plaintiff has not identified any non-pregnant counterpart treated more favorably in similar circumstances.

First, viewing the facts favorably to the non-moving plaintiff, she has established a sufficient factual showing that she was qualified.  The plaintiff testified that she graduated from Athens State University in 2004 with a Bachelor of Science in Elementary Education, received a master's degree in Elementary

Education from the University of Alabama at Gadsden in 2006, and earned her Administrative Certification from the University of Alabama in Gadsden in 2010. (Maples Depo., p. 11).  The plaintiff also earned an Educational Specialist degree in Instructional Leadership from the University of Alabama at Gadsden in 2011. (Id.)  The plaintiff had been employed as an elementary educator at Arab City Schools from 2004-2006; Vestavia Hills City Schools from 2006-2009, where she received tenure; Whitesburg Christian Academy from 2009-2010; and Madison City Schools from 2010-2013.  (Id. at 13-14, 20-21).  Prior to being non-renewed by Madison City Schools, she had never had her employment terminated or non-renewed; rather, she left her various teaching jobs when her husband obtained work in other parts of the state.  She left Whitesburg Christian Academy, specifically, because she wanted to work in the public school system.  (Id. at 19-21).  Although the defendant contends that the plaintiff was not performing her job well, her education and past work experience is sufficient to show that she had the necessary qualifications for her job.  Also, for many of the same reasons recounted above, a factfinder could reasonably conclude from the evidence that the defendant Board itself considered her qualified to teach elementary school children.  She was given good evaluations by her principal (Barkley), including a recommendation that she be considered for an assistant principal position.  She was named to

leadership positions within her school.  At the very least, the court cannot say as a matter of law that she was not qualified for her position as a teacher.

The defendant also contends that the plaintiff cannot show more favorable treatment of employees who were not pregnant and did not take maternity leave. During the 2012-2013 school year, there were sixteen non-tenured teachers.[10] (Doc. 28-4, pp. 2-3).  Of those non-tenured teachers, three took leave for a pregnancy during the 2012-2013 school year: the plaintiff, Machado, and Latham. The plaintiff's employment was non-renewed, Latham notified Barkley of her intent to resign prior to the April 2013 staffing meeting, and Machado was discussed for non-renewal but, upon discovery that she had obtained tenure, was removed from discussions.  It was only after it was discovered that Machado was tenured that a teacher who had not taken pregnancy leave during the 2012-2013 school year was chosen to be non-renewed along with the plaintiff and Hosier.  Of the non-tenured teachers who retained their employment at Mill Creek, none had taken pregnancy leave during the 2012-2013 school year. Viewing this evidence favorably to the plaintiff, initially it was *only* teachers who had taken maternity leave during the 2012-2013 who were considered for non-renewal.  None of the other non-tenured teachers were considered until it was determined that Machado was tenured. The court determines that the evidence put forth by the plaintiff is

---

[10]  Only non-tenured teachers were comparable to plaintiff.  Tenured teachers had job protection that plaintiff and other non-tenured teachers did not.

sufficient to state a *prima facie* claim for discrimination, thereby shifting the burden to the defendant to state a legitimate, nondiscriminatory reason for the adverse employment action suffered by the plaintiff.

### B. Legitimate, Nondiscriminatory Reason

The defendant argues that the plaintiff's employment was non-renewed due to her poor job performance.  As discussed above, the defendant asserts that the plaintiff was non-renewed due to complaints received about her as well as her students' low test scores.  As the court previously stated, this is sufficient to shift the burden back to the plaintiff to show pretext.  Accordingly, the burden shifts about to the plaintiff to show that the legitimate, nondiscriminatory reasons stated by the defendant for the plaintiff's nonrenewal.

### C. Pretext

The defendant argues that the plaintiff cannot show pretext because she has failed to name a "valid non-pregnant comparator who was treated more favorably than her." (Doc. 29, p. 30).  The court is not persuaded.  As noted above, the evidence reveals the stark picture that, of sixteen non-tenured teachers at Mill Creek, *only* those three who had taken pregnancy leave were considered initially for non-renewal.  In a very real way, plaintiff's comparators were the non-pregnant, non-tenured teachers who were similarly situated to the plaintiff in every way except they did not take pregnancy leave.  Plainly, they treated more favorably

than she because they were never threatened with non-renewal of their employment, much less actually being non-renewed.  A non-pregnant, non-tenured teacher (Alexander) was added for non-renewal consideration by Barkley only after she discovered that one of the original three (Machado) was, in fact, tenured. Plaintiff has identified several comparators who were not tenured teachers, similar to her in every way, except they did not take pregnancy leave during the year the rezoning impacted the allocation of teachers at Mill Creek.

Furthermore, the Eleventh Circuit has stated that a plaintiff may prevail on a gender discrimination claim without comparator evidence "if she presents sufficient evidence that would allow a jury to infer that . . . the decision-maker intentionally discriminated against her [because of her sex]."  Galdamez v. DHL Air Exp. USA, 578 Fed. Appx. 887, 892 (11th Cir. 2014).  In order to do so, the plaintiff must present 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'"  Id. quoting Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011).  "An inference[] is not a suspicion or a guess.  It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact."  Smith, 644 F.3d at 1328 n. 25 (quotation marks and alterations omitted).

For purposes of summary judgment, the court must take the facts in the light most favorable to the plaintiff.  As such, the plaintiff has set forth evidence

sufficient to allow a reasonable jury to infer that her employment was non-renewed because of her pregnancy, not because of the reasons claimed by the defendant. The plaintiff testified in her affidavit that she was told her non-renewal was due to the rezoning plan, not performance deficiencies. (Doc. 32-1, ¶ 3). Maples further notes that she was selected by Barkley to serve on various committees or in leadership positions during her time at Mill Creek. She was selected to serve as the third-grade Technology Committee Leader during the 2010-2011 school year. (Id. at ¶ 7). During the 2012-2013 school year, she was chosen by Barkley and McKay as one of the leaders of the vertical communications team, which required her to serve as a liaison between the administration and the team and to communicate with faculty and parents. (Id. at ¶ 10). During the same school year, she was chosen to serve as the inclusion teacher for third grade, which gave her the responsibility of implementing accommodations for special education students to help improve the learning of those students. (Id. at ¶ 9). During the 2012-2013 school year, Maples also was selected to be a member of the school's Strategic Leadership Team and was named "grade level teacher" for the third grade. (Id. at ¶¶ 11-12). McKay informed the plaintiff that she was selected as the grade level teacher because she had an administrative degree. (Id. at ¶ 12). As grade level teacher, the plaintiff was tasked with conducting meetings with the other third-grade teachers and informing the teachers of communications from the

administration. (Id.) During both the 2011-2012 and 2012-2013 school years, the plaintiff's classroom was named an "Accelerated Reader Model Classroom," recognizing the plaintiff's success with helping students focus on the goal of reading improvement. (Id. at ¶ 8). It can be inferred by this evidence that Barkley and McKay had enough confidence in the plaintiff to appoint her to these various positions.

The plaintiff testified in her affidavit that she was never informed by Barkley or McKay that her performance was deficient, and, in fact, she only received positive feedback from Barkley and McKay – be it written or verbal. (Id. at ¶¶ 16-17). On the other hand, the plaintiff testified that she personally observed McKay, during the 2012-2013 school year, discussing parental complaints with fellow-teacher Machado. (Id. at ¶ 15). Maples denies that she ever met with Barkley or McKay about complaints by parents, use of inappropriate tone with parents, or lack of collaboration with colleagues. (Id. at ¶ 20). Maples further denies that Barkley or McKay ever expressed criticism with regard to the test scores earned by the plaintiffs' students. (Id. at ¶ 22). Barkley also did not mention students' test scores during data meetings, which were conducted at least quarterly and during which test data for all teachers and the entire grade level was discussed. (Id. at ¶¶ 23, 25). Additionally, the plaintiff did not ever receive written notice regarding her students' test scores being too low. (Id. at ¶ 28). The

plaintiff stated that during her time at Mill Creek, she was not told how she was performing from year-to-year, she did not have regular conversations with Barkley to discuss her classroom performance, and she was never given suggestions to improve her teaching. (Id. at ¶¶ 31-33).

The plaintiff testified that she, Jessica Latham, and Katie Machado took pregnancy leave during the 2012-2013 school year. (Id. at ¶ 13). Of those three, Machado had been discussed for non-renewal, but discussion of Machado was tabled when it was determined that she achieved tenure mid-year; Latham resigned, notifying Barkley of her intent to resign prior to the non-renewal discussions; and the plaintiff was non-renewed. The plaintiff contends that each of the teachers who took pregnancy-related leave during the 2012-2013 school year were considered for termination or non-renewal at the end of the year. Furthermore, the plaintiff states that non-tenured teachers Taylor Dinges, Emily Ortiz, Kimberly Pratt, Traci Stewart, and Tosha Swearingen were teachers at Mill Creek who did not take pregnancy-related leave during the 2012-2013 school year. (Id. at ¶ 14). These teachers all were retained at the end of the year. (Id.) There is no documented evidence, beyond contested deposition testimony, provided by the defendant to contradict the plaintiff's claims.

Taking the facts in the light most favorable to the non-moving party, which the court must, the plaintiff has submitted enough evidence to cast serious doubt on

the defendant's assertion that the plaintiff was non-renewed simply because of poor performance.  The complaints about Maples' classroom behavior are not documented, and it appears that other, non-pregnant teachers were treated better than the plaintiff.  Accordingly, the plaintiff has set forth evidence composing 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'"  <u>Galdamez v. DHL Air Exp. USA</u>, 578 Fed. Appx. 887, 892 (11th Cir. 2014) quoting <u>Smith v. Lockheed-Martin Corp.</u>, 644 F.3d 1321, 1328 (11th Cir. 2011).  Accordingly, the defendant's motion for summary judgment as to Count III, the plaintiff's Title VII claim, is due to be denied.


## CONCLUSION

For the reasons set forth herein, the defendant's Motion for Summary Judgment is DENIED as to all claims.

DONE this 6th day of October, 2016.


_____
T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE